UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                           Cr. No.  <u>07-543 (DLI)</u>

RUSSELL DEFREITAS,
        also known as "Mohammed,"
KAREEM IBRAHIM,
        also known as "Amir Kareem" and
        "Winston Kingston,"
ABDUL KADIR,
        also known as "Aubrey Michael
        Seaforth," and
ABDEL NUR,
        also known as "Compton Eversley,"

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


GOVERNMENT'S MEMORANDUM IN SUPPORT
OF ITS MOTION FOR AN ANONYMOUS JURY
<u>AND OTHER RELATED PROTECTIVE MEASURES</u>

                      BENTON J. CAMPBELL
                      United States Attorney
                      Eastern District of New York
                      271 Cadman Plaza East
                      Brooklyn, New York 11201

MARSHALL L. MILLER
JEFFREY H. KNOX
BERIT W. BERGER
ZAINAB AHMAD
Assistant United States Attorneys
    (Of Counsel)

## PRELIMINARY STATEMENT

The government submits this memorandum of law in support of its motion for an anonymous jury and other related protective measures. Specifically, the government requests that the names, addresses and workplaces of members of both the venire and petit juries not be revealed, that the jurors be kept together during recesses and taken or provided lunch as a group each day during trial, and that they be escorted to and from the courthouse each day during trial in a manner to be arranged by the United States Marshals Service. In short, the government asks that the Court empanel an anonymous and semi-sequestered jury in this matter.

Anonymous juries subject to these additional precautions have been used in several prominent terrorism cases, including cases in the Eastern District of New York. See, e.g., United States v. Al-Moayad, 03 CR 1322 (SJ) (E.D.N.Y.) (prosecution relating to the provision of material support to designated terrorist organizations Al Qaeda and Hamas); United States v. Sattar, 02 CR 395 (JGK) (S.D.N.Y.) (prosecution of defense attorney and two co-conspirators for involvement with Sheikh Omar Abdel Rahman). This Court has also empaneled anonymous juries in cases involving violent gangs and organized crime families. See, e.g., United States v. Aguilar, 01 CR 1367 (RJD) (E.D.N.Y.). Recently, in early 2009, Chief Judge Raymond J. Dearie granted a motion for an anonymous jury subject to these precautions in a case involving terrorism charges, though the defendants pled guilty during jury selection. See United States v. Sarachandran, et al., 06 CR 615 (RJD) (E.D.N.Y.).

The same factors that warranted an anonymous jury and other protective measures in those cases compel the same result here. As discussed below, because this case involves charges of terrorist activity, the defendants' contact with violent organizations, ████████████████████████████████████████, and

substantial media attention, a fair trial requires empaneling an anonymous jury and other requested protective measures.

## FACTUAL BACKGROUND

Defendants Russell Defreitas ("DEFREITAS"), Kareem Ibrahim ("IBRAHIM), Abdul Kadir ("KADIR") and Abdel Nur ("NUR") have been charged with crimes relating to their conspiracy to attack John F. Kennedy International Airport in Jamaica, New York ("JFK Airport") with explosives, including: conspiracy to attack a public transportation system, in violation of 18 U.S.C. § 2332f; conspiracy to destroy a building with fire and explosives, in violation of 18 U.S.C. § 844; conspiracy to attack aircraft and aircraft materials, 18 U.S.C. § 32; conspiracy to destroy international airport facilities, in violation of 18 U.S.C. § 37; and conspiracy to attack a mass transportation facility, in violation of 18 U.S.C. § 1992.  In addition, defendants DEFREITAS and KADIR have also been charged with conducting surveillance of a mass transportation facility with intent to attack that facility, in violation of 18 U.S.C. § 1992.

I.     The Conspiracy to Attack JFK Airport

The following is a summary of facts that the government expects to establish at trial through witness and expert testimony, consensually recorded meetings and telephone conversations, computer media and physical and documentary evidence.

John F. Kennedy International Airport in Queens, New York ("JFK Airport") provides regular air transportation services to the general public, including both passenger and cargo services.  As of 2007, over one thousand airplanes, most of which provide regular and continuing general transportation services to the public, departed and arrived at JFK Airport on an average day; approximately half of those flights were international flights. Fuel tanks located at JFK Airport are linked to the Buckeye Pipeline, which distributes fuel and other petroleum products to various sites from approximately Allentown, Pennsylvania,

through New Jersey, Staten Island, Brooklyn and Queens, New York, among other locations. The Buckeye Pipeline is the primary transporter of jet fuel into JFK Airport and other New York area airports.

DEFREITAS is a naturalized United States citizen born in Guyana. During the 1990s, DEFREITAS worked at JFK Airport for Evergreen International Airlines, a cargo shipping company, and Ogden Aviation, an airplane servicing company. In early 2006, DEFREITAS and others began plotting to conduct a terrorist attack at JFK Airport by, inter alia, exploding fuel tanks and the connecting pipeline. As he would later explain, DEFREITAS had been planning an attack for several years—"from the time I worked in the airport, before terrorism started in this country..."[1]

In August 2006, DEFREITAS recruited a confidential source (the "Source")[2] to join in the plot to attack JFK Airport. The Source had never been to Trinidad or Guyana, and had no specific knowledge of JFK Airport beyond that as an occasional airline passenger. In the weeks that followed, DEFREITAS and another member of the plot, who lived in Guyana, invited the Source to travel to Guyana for *Ramadan* and to further develop their plans to conduct the terrorist attack.

DEFREITAS traveled to Guyana on or about August 17, 2006, and the Source traveled to Guyana on or about September 20, 2006. While in Guyana, DEFREITAS, the Source and multiple co-conspirators met several times to discuss the JFK Airport plot. Among other topics, the conspirators discussed contacting associates in Guyana, Trinidad and

---

[1] Statements of the defendants set forth herein are in part and in sum and substance. Excerpts of consensually recorded conversations are from summaries and draft transcripts.

[2] The government has been working with the Source since 2004. The Source was convicted on federal drug trafficking and RICO charges in the Southern District of New York in 1996. The Source was also convicted on drug trafficking charges in New York Supreme Court in 2003. His sentence in that case is pending as part of his cooperation agreement with the government. In addition to the expectation of a reduced sentence in exchange for his cooperation, the Source also receives financial assistance. The Source has provided extremely credible information that has been corroborated by consensual recordings, e-mails, financial documents, surveillance and other records and information.

elsewhere for financing, technical expertise and personnel. They discussed meeting with Yasin Abu Bakr, the leader of the Trinidadian militant group Jamaat Al Muslimeen ("JAM"), which controlled the "underground" in Trinidad. Abu Bakr was believed to have the means to locate a known al-Qaeda operative who had connections to Guyana and was rumored to be hiding in the Caribbean. They agreed to arrange for an associate, later identified as defendant ABDEL NUR, a longtime associate of Abu Bakr, to travel to Trinidad to setup a meeting with him. The initial plan was for NUR to travel to Trinidad in early December 2006, but the trip was delayed because NUR's passport had expired.

The Source returned to New York on October 27, 2006, and DEFREITAS returned on January 1, 2007. DEFREITAS and the Source conducted surveillance at JFK Airport four times–on or about January 3, 4, 10 and 11, 2007. During each trip, DEFREITAS and the Source traveled in the Source's vehicle, and DEFREITAS directed the Source where to go. On the last two trips, DEFREITAS videotaped the locations. During the trips, DEFREITAS pointed out fuel tank stations, locations of parked airplanes, the control tower and travel routes to and from the target locations.

On several occasions, DEFREITAS and the Source called a co-conspirator in Guyana to report on their surveillance. During one such conversation, on January 3, 2007, they discussed sending their contact–a reference to NUR–to Trinidad for his "mission," but that NUR was having difficulty getting travel documents. In subsequent conversations, they discussed purchasing an airline ticket for NUR to travel to Trinidad to meet with JAM leader Abu Bakr. A subsequent search of NUR's residence in Georgetown, Guyana on June 3, 2007 by Guyanese law enforcement officials yielded a printed itinerary for an airline ticket in NUR's birth name, Compton Eversley, for a trip to Trinidad on January 28, 2007. However,

NUR was unable to travel to Trinidad in January 2007 because he did not have the necessary travel documents.

DEFREITAS and the Source returned to Guyana on or about January 14, 2007, carrying with them the JFK Airport surveillance video. DEFREITAS and the Source met with NUR and other co-conspirators while in Guyana, and played the JFK Airport video and explained the JFK attack plan to them. They discussed the type of explosives that they could use to blow-up the fuel tanks and pipeline, as well as methods to transport the explosives to the United States. In late January 2007, two of the co-conspirators became increasingly suspicious that a spy for the Guyanese government had infiltrated the group. Eventually, they ceased participation in the plot.

Over the next several weeks, DEFREITAS contacted other associates in Guyana to solicit their participation in the attack and attempt to make contact with Abu Bakr or other militants. On or about February 18, 2007, DEFREITAS and the Source met with an intermediary, and DEFREITAS told him about the JFK Airport plot and their desire to discuss it with Abu Bakr. The intermediary identified two associates whom he thought might be interested in the plot. The first was the defendant ABDUL KADIR, a citizen of Guyana, who had been a member of the Guyanese Parliament, the former mayor of Linden, Guyana and a Shiite leader. According to the intermediary, KADIR had connections with militants in Iran and Venezuela.

On or about February 19 and 20, 2007, DEFREITAS, the intermediary and the Source traveled to Linden, Guyana, and met with KADIR. They played the JFK Airport surveillance video for KADIR. KADIR expressed interest in furthering the JFK plot, saying that he needed a few weeks to contact some associates who would probably help them. KADIR informed DEFREITAS and the Source that his associates had their own rules of engagement and wanted to reduce the killing of innocents, such as women and children.

KADIR proposed causing explosions at JFK Airport in the early morning hours so that the damage would primarily be economic in nature. KADIR also said that the JFK Airport video was not sufficiently detailed for operational purposes, and told them to use Google Earth software to get more detailed pictures of JFK Airport after they returned to New York. KADIR also told DEFREITAS to download the JFK Airport video onto a thumb drive–a computer data storage device–or DVD and hide it. The conspirators code-named the plot to attack JFK Airport "the chicken hatchery" or "chicken farm" for future communications.

DEFREITAS also informed KADIR about the conspirators' desire to travel to Trinidad to present the plan to JAM leader Abu Bakr. DEFREITAS said that the defendant NUR would travel with them and make the introduction. KADIR said that previously, he (KADIR) had introduced NUR to Abu Bakr, and that NUR was the right person to make the introduction.

DEFREITAS and the Source returned to New York on or about February 28, 2007, landing at JFK Airport. The next day, DEFREITAS told the Source that Customs officers at JFK Airport had questioned and harassed him (DEFREITAS), searched his belongings and made copies of several documents, including papers with KADIR's contact information. DEFREITAS told the Source that he was extremely suspicious that the United States government knew about their plans. The Source told DEFREITAS that he (Source) had been questioned by Guyanese officers at the airport in Guyana. Then, on or about March 1, 2007, DEFREITAS told the Source that he had called KADIR to inform him about the incident at the airport. On March 5, DEFREITAS and the Source placed a telephone call to KADIR. The Source told KADIR that he had used the software Google Earth and had found the "chicken farm," the code name for the JFK Airport plot. On or about March 7, KADIR advised the Source that "the folks don't want to deal with that hatchery" because "right now

it is too sensitive," an apparent reference to the search and questioning of DEFREITAS by officers of United States Customs and Border Protection on or about February 28, 2007.

In early April 2007, DEFREITAS and the Source discussed obtaining airline tickets to travel to Trinidad to meet with Abu Bakr about the JFK Airport plot. The Source arranged to get three tickets from a purported business associate. While the Source suggested that NUR accompany them to Trinidad to make the introduction to Abu Bakr, DEFREITAS told the Source that they should instead give the third ticket to KADIR, and have KADIR make the introduction. On April 14, DEFREITAS and the Source placed another telephone call to KADIR. Communicating in coded language, KADIR agreed to arrange a meeting with Abu Bakr in Trinidad to request his assistance in the JFK Airport plot. DEFREITAS and the Source arranged to travel to Guyana on May 10, 2007, and KADIR, DEFREITAS and the Source arranged to travel together from Guyana to Trinidad on May 20.

DEFREITAS and the Source traveled from New York to Guyana on or about May 10, 2007. During a meeting among KADIR, DEFREITAS and the Source, KADIR told DEFREITAS and the Source that he was going to take them to meet with Abu Bakr in Trinidad, and confirmed their travel dates. KADIR said that he was sending one of his associates to Trinidad on May 13 to arrange the meeting with the JAM leader. Later in the day, DEFREITAS and the Source showed KADIR the JFK Airport video and Google Earth satellite images of JFK Airport. DEFREITAS identified, among other things, the fuel tank locations and air traffic control tower. DEFREITAS explained that because JFK Airport security monitored the fuel tank locations from the tower, disabling the control tower was a key to the operation. KADIR asked many questions about the maps, including the distance between the street and the fuel tanks. DEFREITAS asked KADIR, who is an engineer by education and training, about the composition of the tanks. KADIR explained, in sum and substance, that they were probably double tanks, i.e., a tank within the tank. KADIR said that

two explosions would be necessary to ignite the fuel inside the inner tank, and explained that fuel needs oxygen to explode.

On or about May 19, 2007, KADIR met with the Source.  KADIR explained that he would be unable to travel to Trinidad because of a "project" that required his presence in Guyana on May 21 and 22.  KADIR explained, however, that he had "called the brothers in Trinidad" and arranged for them to meet DEFREITAS and the Source at the airport, give them a place to stay and ensure their security.  KADIR said that he would talk to the "brothers" about the meeting with Abu Bakr.  KADIR also advised the Source how they should handle themselves in Trinidad, including during the meeting with Abu Bakr.  He explained that Abu Bakr was under "serious surveillance . . . to the point of the international, because they see he has links with Mohamar Qadafi."  KADIR warned the Source to avoid traveling "with anything that can implicate you," and specifically referred to the JFK Airport images.  KADIR said that "if you get to meet Abu Bakr, be very careful with what you tell him," and advised that NUR should be the one to make the introduction "[b]ecause ABDEL NUR knows him, and he can open up something like that to him."

On May 20, 2007, DEFREITAS and the Source traveled to Trinidad.  NUR traveled there as well on a different flight.  As KADIR had arranged, an associate of KADIR picked up DEFREITAS and the Source at the airport and took them to the residence of the defendant IBRAHIM, another associate of KADIR.  On May 22, 2007, IBRAHIM, DEFREITAS and the Source traveled to one of the compounds of Abu Bakr where they located NUR.  NUR explained that he had been at the location from the time he arrived in Trinidad on May 20.  NUR told the Source and DEFREITAS that he had met with Abu Bakr about the plot.  According to NUR, Abu Bakr suggested that NUR, DEFREITAS and the Source come back a few days later to discuss the plan in detail.  Abu Bakr also advised that he wanted to do some "checks" on DEFREITAS and the Source before any meeting.  In a later

conversation with the Source, NUR acknowledged that he explained the "chicken farm" to Abu Bakr. NUR said that Abu Bakr responded that if he was interested, he could have his "contacts" sell the plan to individuals "abroad."

DEFREITAS, NUR, IBRAHIM and the Source left the compound and, later that evening, returned to IBRAHIM's residence. NUR, DEFREITAS, IBRAHIM and the Source then called KADIR in Guyana. NUR informed KADIR that he had met with Abu Bakr and presented the plan to him, and made arrangements for NUR, DEFREITAS and the Source to meet with Abu Bakr later in the week. NUR said that KADIR said he (KADIR) was pleased.

Late in the evening on May 23, 2007, in the presence of NUR and the Source, DEFREITAS advised IBRAHIM about the JFK Airport plot in detail. As he had with KADIR, DEFREITAS informed IBRAHIM about the plan to explode fuel tanks at JFK Airport. DEFREITAS and the Source played the JFK Airport video and showed IBRAHIM the Google Earth images. DEFREITAS further explained that they intended to present the plan to Abu Bakr, but had concerns about their safety. IBRAHIM advised against presenting the plan to Abu Bakr, and instead said that he (IBRAHIM) would present the plan to his contacts in the Middle East who may be interested in purchasing or funding it. IBRAHIM instructed DEFREITAS, NUR and the Source to leave the JFK Airport video and Google images with him so that, if his contacts overseas were interested, he would have the items available to show them. IBRAHIM stated that the items would be kept in a safe place in Tobago. DEFREITAS agreed.

DEFREITAS, IBRAHIM, NUR and the Source discussed the JFK Airport plot in further detail the next day. IBRAHIM explained that he would send one of his "trusted" associates to present the plot to IBRAHIM's contacts in Iran and/or the United Kingdom who were connected with the "revolutionary movement" In Iran. The defendants also discussed

what to do with any money received from individuals in Iran or elsewhere willing to fund the plot. DEFREITAS proposed that the money collected should be held in an account controlled by KADIR. IBRAHIM, DEFREITAS, NUR and the Source then called KADIR to ask whether KADIR's mosque account could be used to hold the money. KADIR agreed to DEFREITAS's proposal.

The next day, May 25, 2007, IBRAHIM and NUR accompanied DEFREITAS and the Source to the airport in Trinidad and Tobago for their return trip to New York. While at the airport, the defendants continued to discuss the JFK Airport plot and their plans going forward. IBRAHIM stated that his "next move" was to raise money and send an emissary to Iran. IBRAHIM also mentioned the possibility of a direct meeting with a contact from the United Kingdom who, as noted, was associated with a "movement" there. IBRAHIM stated that this individual could travel to Tobago to discuss the plot.

DEFREITAS and the Source returned to New York on or about May 26, 2007. On May 29, DEFREITAS and the Source called IBRAHIM in Trinidad to discuss developments in the JFK Airport plot. Using coded language, IBRAHIM explained that he had recruited one of his associates, whom DEFREITAS and the Source had met during their trip to Trinidad, to travel to Iran and present the plot to militants there. IBRAHIM explained that his associate would travel after obtaining necessary travel documents.

On May 31, 2007, KADIR arrived at the Port of Spain airport in Trinidad from Guyana. The next day, June 1, 2007, KADIR was arrested after boarding a flight from Trinidad to Venezuela. KADIR acknowledged that he had traveled to Trinidad en route to Venezuela, and that he intended to travel from Venezuela to Iran. DEFREITAS was arrested in New York on June 1, and IBRAHIM and NUR were arrested in Trinidad on June 2 and 5, respectively.

II.    Media Attention

Since the defendants' arrests, domestic and foreign media organizations have closely tracked the case.  In June 2007, the arrest and indictment of the defendants garnered substantial publicity, both in the United States and abroad.  See, e.g., "4 Men Accused of Plot to Blow Up Kennedy Airport Terminals and Fuel Lines," New York Times, 6/3/07; "Pipeline Bomb Strike Foiled," New York Post, 6/3/07; "Feds: JFK Plotter Out to 'Get' U.S.," USA Today, 6/3/07; "Four Charged over JFK 'Bomb Plot," BBC News, 6/3/07; "4 Indicted in JFK Terror Plot," New York Daily News, 6/29/07.

Since June 2007, the media has continued to cover the case, including all of its major developments.  See, e.g., "Judge OKs Extradition of JFK Plot Suspects," New York Daily News, 8/6/07; "JFK Bomb Suspects Nearer Extradition," New York Daily News, 8/7/07; "Extradition Ordered for Three Accused in Airport Bomb Plot," New York Times, 8/7/07; "3 Extradited in Alleged Airport Plot," Los Angeles Times, 6/26/08; "3 Plead Not Guilty in Plot to Bomb JFK," CNN, 6/26/08; "Evidence Tied Kadir to Accused Iranian Terrorist–FBI Investigator Says in JFK Bomb Plot Case," Starobrek News, 2/8/10.  There is every reason to expect that this coverage will continue during trial.

III.    Threats to Witnesses



12

███████████

The defendants' association with the Trinidian militant group JAM also raises concerns about juror safety and the integrity of the judicial process. JAM has a long history of violence. In 1990, JAM staged a coup attempt in Trinidad. More than 100 armed JAM members, led by Abu Bakr, stormed the Parliament building and took several hostages, including the Trinidadian Prime Minister and several cabinet members. 24 people died during the incident. Abu Bakr and other JAM members who participated in the attack were granted amnesty after agreeing to surrender. In the 20 years since the coup attempt, JAM has continued its pattern of violence and criminality, conducting several murders, international drug trafficking, kidnapping, money laundering, extortion and political corruption. Abu Bakr is also known to have links with Libyan leader Mohamar Qadafi and other Islamic militant organizations. See, e.g., "Jamaat al-Muslimeen: The Growth and Decline of Islamist Militancy in Trinidad and Tobago," Terrorism Monitor, Vol. 7, Issue 23, 7/30/09 (available at http://www.jamestown.org).

JAM is notorious for witness tampering and otherwise obstructing the judicial process. Abu Bakr and his followers escaped prosecution for the 1990 coup attempt. Id. ("In spite of its record, ranking JAM members have escaped serious prosecution for their most egregious actions. For many Trinidadians, the state's failure (or what some believe is its reluctance) to bring closure to the 1990 revolt that left scores dead and injured and caused millions of dollars in damages continues to provoke heated controversy. The ability of senior JAM members to evade justice for their involvement in the uprising and an array of other militant and criminal acts also continues to astound observers who follow the group.").

---

3 ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████

Recent examples of witness tampering and obstruction of justice including kidnapping and murder. For example, in 2005, the body of a witness against a JAM member was "found in a lake, shot, wrapped in plastic and weighted with rocks." "Kidnappings Send a Chill Through Sunny Trinidad," Trinidad and Tobago News, 1/3/05. Indeed, Abu Bakr was unsuccessfully prosecuted in 2006 for conspiracy to murder several of the group's former members who had spoken out publicly against the Jamaat al Muslimeen and its practices, and who were suspected of becoming witnesses in legal proceedings against its members. "Jamaat al-Muslimeen: The Growth and Decline of Islamist Militancy in Trinidad and Tobago," Terrorism Monitor; Wikipedia (available at http://en.wikipedia.org/wiki/Jamaat_al_Muslimeen).

## DISCUSSION

I.    Applicable Legal Standard

      The Second Circuit has repeatedly upheld the use of anonymous juries where there is reason to believe that the jury needs protection, and reasonable precautions have been taken to minimize any adverse effect on the jurors' opinion of the defendants. See United States v. Gotti, 459 F.3d 296, 345 (2d Cir. 2006); United States v. Aulicino, 44 F.3d 1102, 1116 (2d Cir. 1995); United States v. Wong, 40 F.3d 1347, 1376-77 (2d Cir. 1994); United States v. Thai, 29 F.3d 785, 800-01 (2d Cir. 1994); United States v. Amuso, 21 F.3d 1251, 1264-65 (2d Cir. 1994); United States v. Locascio, 6 F.3d 924 (2d Cir. 1993); United States v. Paccione, 949 F.2d 1183, 1192 (2d Cir. 1991); United States v. Vario, 943 F.2d 236, 239 (2d Cir. 1991); United States v. Tutino, 883 F.2d 1125, 1132 (2d Cir. 1989); United States v. Persico, 832 F.2d 705, 717 (2d Cir. 1987); United States v. Thomas, 757 F.2d 1359, 1364-65 (2d Cir. 1985); United States v. Barnes, 604 F.2d 121, 133-43 (2d Cir. 1979).

More recently, the Second Circuit reiterated that "the use of an anonymous jury does not infringe a defendant's constitutional rights, so long as the court conducts a <u>voir dire</u> designed to uncover any bias as to the issues or the defendants and takes care to give the jurors a plausible and nonprejudicial reason for not disclosing their identities." <u>Aulicino</u>, 44 F.3d at 1116.  The decision to utilize an anonymous jury "is left to the district court's discretion." <u>Paccione</u>, 949 F.2d at 1192.

Courts in the Eastern District of New York have consistently empaneled anonymous juries in appropriate cases.  <u>See, e.g. United States v. Stone</u>, 05 CR 401 (ILG) (fully anonymous and partially sequestered jury); <u>United States v. Rosado</u>, 728 F. 2d 89 (2d Cir. 1994); <u>United States v. Amuso</u>, 90 CR 446 (E.D.N.Y. 1992) , <u>aff'd</u>, 21 F.3d at 1264-65 (2d Cir. 1994); <u>United States v. Legrano</u>, 93 CR 1231 (ARR) (fully anonymous and partially sequestered jury); <u>United States v. Cutolo</u>, 93 CR 1230 (EHN) (same); <u>United States v. Bisaccia</u>, 93 CR 479 (ILG) (same); <u>United States v. Persico</u>, 92 CR 351 (CPS) (two trials) (same); <u>United States v. Orena</u>, 93 CR 1366 (ERK) (same); <u>United States v. Malpeso</u>, 93 CR 1365 (RJD) (same); <u>United States v. Orena</u>, 92 CR 351 (S-4) (JBW) (three trials) (same, except jury only partially anonymous).

Anonymous juries have been found to be particularly appropriate in cases involving terrorism in both the Eastern and Southern Districts of New York.  <u>See, e.g., United States v. Sarachandran, et al.</u>, 06 CR 615 (RJD) (E.D.N.Y.) (prosecution for provision of material support to Liberation Tigers of Tamil Eelam and attempted purchase of anti-aircraft missiles) ; <u>United States v. Al-Moayad</u>, 03 CR 1322 (SJ) (E.D.N.Y.) (prosecution for provision of material support to designated terrorist organizations Al Qaeda and Hamas); <u>United States v. Sattar</u>, 02 CR 395 (JGK) (S.D.N.Y.) (prosecution of defense attorney Lynne Stewart and others with Sheikh Omar Abdel Rahman); <u>United States v. Bin Laden</u>, 98 CR 1023 (LBS) (S.D.N.Y.) (bombings of United States Embassies in Kenya and Tanzania);

15

United States v. Salameh, 93 CR 180 (KTD) (S.D.N.Y.) (prosecution of 1993 World Trade Center bombing); United States v. Yousef, 93 CR 180 (KTD) (S.D.N.Y.) (prosecution of 1993 World Trade Center bombing); United States v. Yousef, 93 CR 180 (KTD) (S.D.N.Y.) (severed prosecution of plot to bomb American airliners flying out of Southeast Asia); United States v. Rahman, 93 CR 181 (MBM) (S.D.N.Y.) (conspiracy to wage war against the United States by Sheikh Omar Abdel Rahman and others); see also Rosado, 728 F. 2d at 94-95 (anonymous jury appropriate in contempt proceeding given allegations and statements that had been made concerning connection or interest of persons using violence to achieve political objectives); United States v. Koubriti, 252 F. Supp. 2d 418, 419 (E.D. Mich. 2003) ("first post-September 11 case to go to trial which raise[d] issues bearing on international terrorism").

The Second Circuit has identified three factors to consider in determining whether an anonymous jury is appropriate: (1) the seriousness of the charges against the defendants; (2) the potential threat of corruption of the judicial process; and (3) the expectation of potential publicity. See Gotti, 459 F.3d at 346; Aulicino, 44 F.3d at 1116; Thai, 29 F.3d at 801; Paccione, 949 F.2d at 1192-93; Vario, 943 F.2d at 240; Tutino, 883 F.2d at 1132; Persico, 832 F.2d at 717; Ferguson, 758 F.2d at 854; Barnes, 604 F.2d at 141.

In United States v. Barnes, the Second Circuit upheld the empaneling of an anonymous jury and noted that "in a case that generated as much pretrial publicity as [Barnes] and in which allegations of dangerous and unscrupulous conduct abounded, precaution was best taken so that fears would not become realities." 604 F.2d at 141. The Barnes court specifically rejected any claim that the law requires jurors to disclose their identities:

> If a juror feels that he and his family may be subjected to violence or death at the hands of a defendant or his friends, how can his judgment be as free and impartial as the Constitution requires? If the anonymous juror feels less pressure as a result of anonymity,...this is as it should be—a factor contributing to his impartiality.

Id. at 140-41.

In United States v. Thomas, 757 F.2d at 1364, the Second Circuit found that the protection of jurors is vital to the function of the criminal justice system and further articulated the importance of using jury anonymity as a mechanism to ensure a jury's fair and impartial verdict free from fear or intimidation:

> As a practical matter, we cannot expect jurors to "take their chances" on what might happen to them as a result of a guilty verdict. Obviously, explicit threats to jurors or their families or even a general fear of retaliation could well affect the jury's ability to render a fair and impartial verdict. <u>Justice requires that when a serious threat to juror safety reasonably is found to exist, precautionary measures must be taken</u>.

Id. (emphasis added).

II.   <u>An Anonymous Jury is Necessary and Appropriate in this Case</u>

Application of the factors set forth by the Second Circuit demonstrates that the empaneling of an anonymous jury is necessary and appropriate in this case. First, the crimes charged in this case are extremely serious and involved a plot to commit a violent, terrorist attack. Second, ████████████████████████████████████ ████, as well as the defendants' ties to JAM, an organization with a history of obstructing justice, establish a potential threat of corruption to the judicial process. Third, this case has attracted extensive media attention since the arrests in June 2007 that is likely only to intensify as the trial approaches and during trial.

A.   <u>Seriousness of the Charges</u>

All four defendants have been charged with conspiring to commit a violent terrorist attack at JFK Airport, including aircraft and aircraft materials, and airport fuel tanks, pipelines and buildings. Defendants DEFREITAS and KADIR have also been charged with conducting surveillance of JFK Airport with intent to attack the airport. The seriousness of these charges is obvious from the face of the indictment, and is underscored by the fact that

all four defendants face statutory minimum sentences of five years if convicted, see 18 U.S.C. § 844, statutory maximum sentences of life in prison, see 18 U.S.C. § 2332f, and guidelines sentences of life in prison, see U.S.S.G. §§ 2A1.5, 2K1.4, 3A1.4.  But the audio recordings, which the government will play for the jury, capture the true severity of the charged crimes: during those recordings, defendant DEFREITAS describes the intended attack at JFK Airport as so big "even the Twin Towers can't touch it." Complaint, ¶ 55.  The serious and violent nature of the charges alone would cause a juror reasonably to fear for his or her own safety.  See Thai, 29 F.3d at 801; Thomas, 757 F.2d at 1364; Barnes, 604 F.2d at 141.  And in particular, the evidence that the defendants associated with JAM, which has been reported to engage in violence, obstruction of justice and witness intimidation, would inevitably increase the fear felt by a juror, absent anonymity and the other requested precautions.

B.  Corruption of Judicial Process

As discussed above, the government possesses evidence that ██████████ ████████████████████████████████████████████████████████ ██████████.  In addition, the Trinidadian militant group JAM has a history of witness tampering and obstructing judicial proceedings.  Where, as here, the defendants, by themselves or through their associates or criminal organization, have the means to interfere with the judicial process, there is a "strong reason to believe the jury needs protection." Gotti, 459 F.3d at 345 (quoting Paccione, 949 F.2d at 1192) (internal quotation marks omitted); see, e.g., Aulicino, 44 F.3d at 1116 (defendant's brother); Wong, 40 F.3d at 1376-77 (Green Dragons street gang); Paccione, 949 F.2d at 1192 (Gambino Crime Family); United States v. Wilson, 493 F. Supp. 2d 397, 399-400 (E.D.N.Y. 2006) (Stapleton Crew street gang). ██████████████████████████████████████████████ and the defendants' association with JAM, an organization that has a history of interfering with the judicial process, provide "strong reason[s]" for empaneling an anonymous jury.

These factors combine to create an environment at trial that "would cause a juror to reasonably fear for his own safety." Vario, 943 F.2d at 241 (anonymous jury appropriate where trial evidence "will depict a pattern of violence by the defendants and [their] associates such as would cause a juror to reasonably fear for his own safety"); see Wong, 40 F.3d at 1376 (recognizing that fears of retaliation may affect the jury's ability to render an impartial verdict). Indeed, a juror might reasonably fear that individuals who conspired to commit a terrorist attack ███████████████████ would also be willing and able to engage in acts of violence directed at jurors to prevent conviction or seek revenge after conviction. Accordingly, an anonymous jury is necessary both to ensure an impartial jury and protect it from harm. See Ferguson, 758 F.2d at 854; Thomas, 757 F.2d at 1364-65.

C.   Publicity

The extensive press coverage in this case also warrants an anonymous jury. As discussed above, foreign and domestic media organizations have closely tracked this case since the announcement of the arrests in August 2007, and publicity during the trial will, no doubt, intensify significantly.

The Second Circuit has repeatedly held that the expectation of publicity at trial weighs in favor of anonymity to avoid the jurors' exposure "to inappropriate contacts that could compromise the trial." Paccione, 949 F.2d at 1193; see Thai, 29 F.3d at 801; Vario, 943 F.2d at 240; Tutino, 883 F.2d at 1132; Persico, 832 F.2d at 717; Barnes, 604 F.2d at 141. Juror anonymity is an effective remedial measure to prevent possible prejudice and inappropriate contact by the press.[4] If jurors could be located by reporters, the fairness of the

---

[4] It is well settled that where media coverage potentially threatens the fairness of a trial, remedial measures must be taken to prevent the prejudice. Sheppard v. Maxwell, 384 U.S. 333, 363 (1966). "The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences." Id. at 363. "[T]he trial court has a responsibility to the public as well as to the defendant to maintain the integrity of the criminal process." United States v. Shiomos, 864 F.2d 16, 18 (3d Cir. 1988); see United States v. Marrone, 502 F. Supp. 983, 1003 (E.D. Pa. 1980) ("the public, as well as the accused, has a

trial could be compromised.  Jury anonymity is an appropriate measure to avoid inappropriate contact and possible prejudice.  Moreover, potential jurors will be more willing to serve if they are confident that they and their families will not be subjected to scrutiny, harassment, and possible threats.  The media's intense interest in this case clearly "militate[s] in favor of an anonymous jury." Vario, 943 F.2d at 240; see Koubriti, 252 F.Supp.2d at 419 (empaneling anonymous jury in material support case "to protect potential jurors from undue harassment by the media and other curiosity-seekers").

Lastly, because anonymity would be useless if jurors were permitted to interact freely with the public in the courthouse during recesses and at the beginning and end of each trial day, the jurors should be kept together during recesses, taken or provided lunch as a group, and escorted to and from the courthouse in a manner designated by the Marshals Service.  Persico, 621 F. Supp. at 880; United States v. Maldonado-Rivera, 922 F.2d 934, 971 (2d Cir. 1990).

III.   An Anonymous Jury Will Not Prejudice the Defendants

Courts confronted with a need to protect jurors from outside influences have taken effective steps to provide for a meaningful and informed jury selection process.  While the right to a meaningful voir dire of jurors is clearly established, Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981), questioning may be limited by the Court.  As the Second Circuit noted in affirming the use of anonymous jury in United States v. Barnes,

> as long as a defendant's substantial rights are protected by a voir dire designed to uncover bias as to issues in the case and as to the defendant himself, then reasonable limitations on the questioning should not be disturbed on appeal.

604 F.2d at 137.

---

substantial interest in having guilt or innocence decided by a jury free from prejudicial influences"), affd, 672 F.2d 904-05 (3d Cir. 1981).

The trial court has substantial discretion in controlling and limiting the voir dire process. See Rosales-Lopez v. United States, 451 U.S. 182, 189 (1981); United States v. Click, 807 F.2d 847, 850 (9th Cir. 1987); United States v. Steel, 759 F.2d 706, 711 (9th Cir. 1985); Barnes, 604 F.2d at 137. A full voir dire may be conducted about subjects other than the juror's name, address and employer's name, and the parties and counsel have an unrestricted opportunity to observe the jurors during the voir dire process. See, e.g., Barnes, 604 at 142-43. Where jury anonymity is warranted, the Second Circuit has found that a defendant's rights are protected by the district court's conduct of "a voir dire designed to uncover bias as to issues in the cases and as to the defendant[s]." Vario, 943 F.2d at 242 (quoting Barnes, 604 F.2d at 140); see Thai, 29 F.3d at 801.[5] Here, through the use of a detailed questionnaire, the parties will be provided with ample information about the background and possible bias of the potential jurors. See, e.g., Thai, 29 F.3d at 801; Paccione, 949 F.2d at 1192; Vario, 943 F.2d at 241-42; Tutino, 883 F.2d at 1133; United States v. Edmond, 730 F. Supp. 1144, 1149 (D.D.C. 1990) (recognizing use of juror questionnaire as efficient means of eliciting information necessary to provide meaningful voir dire while protecting jurors' identities).

Furthermore, courts have rejected defendants' claims that use of an anonymous jury will create the unfair appearance that the defendants are dangerous and that, as a result, the jury will be more likely to convict them. See, e.g., United States v. Branch, 91 F.3d 699, 724 (5th Cir. 1996) (rejecting defendants' objection to an anonymous jury based on the 'speculative inference that the jurors were more likely to render a guilty verdict because of their belief that the defendants were dangerous'). In particular, the Second Circuit has

---

[5] The government requests that an extensive voir dire be conducted in this case. The jury questionnaire, or the Court through voir dire, will likely inquire into each juror's neighborhood or town of residence, field of employment, family history, marital status, family members' occupations, education, knowledge of the alleged participants in these crimes or attorneys in the case, attitudes toward the Government and defendants, and numerous other issues relevant to this trial.

concluded that the danger that the anonymous procedure would cast unfair aspersions on the defendants is substantially minimized where the Court gives the jury a plausible reason for not disclosing their identity or taking other security measures. See Thai, 29 F.3d at 801 (Court stated that "[s]electing an anonymous jury is not an unusual practice and has been followed in many cases in the Federal Court. Anonymity will ward off curiosity that might infringe on juror's privacy . . . "); Paccione, 949 F.2d at 1193 (explained as protection against pressures from the media); Tutino, 883 F.2d at 1133 (jury instructed: "It is a common practice followed in many cases in Federal court to keep the names and identities of the jurors in confidence. This is in no way unusual"). Thus, the Court should issue an instruction informing the jury in a neutral manner that anonymity is necessary to protect them from the media and the curious, and that selection of anonymous juries is not an unusual procedure. See, e.g., Thai, 29 F.3d at 801; Tutino, 833 F.2d at 1133; Barnes, 604 F.2d at 137; Persico, 621 F. Supp. at 879-80.[6]

---

[6] Should the Court grant the government's application for an anonymous jury, the Court should also prohibit the use of any portable device in the courtroom capable of broadcasting photographs of jurors, i.e., cellphones, PDAs or laptop computers that have the capability to record photographic images or video.

## CONCLUSION

For all of the foregoing reasons, the government respectfully requests that its motion for an anonymous jury and other related protective measures be granted.

Dated: Brooklyn, New York
       March 8, 2010

Respectfully submitted,

BENTON J. CAMPBELL
United States Attorney
Eastern District of New York

By:     _____

Marshall L. Miller
Jeffrey H. Knox
Berit W. Berger
Zainab Ahmad
Assistant United States Attorneys

cc:    Mildred Whalen, Esq. (via ECF and email)
       Len Kamdang, Esq. (via ECF and email)
       Michael Hueston, Esq. (via ECF and email)
       Zoe Dolan, Esq. (via ECF and email)
       Kafahni Nkrumah, Esq. (via ECF and email)
       Toni Messina, Esq. (via ECF and email)
       Daniel Nobel, Esq. (via ECF and email)
       Doric Sam, Esq. (via ECF and email)