Case 1:07-cr-00543-DLI   Document 496   Filed 01/24/11   Page 1 of 13

# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

Leonard F. Joy
*Executive Director and*
*Attorney-in-Chief*

*Eastern District*
Peter Kirchheimer
*Attorney-in-Charge*

January 20, 2011

The Honorable Dora L. Irizarry
U.S. District Court Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:   United States v. Russell Defreitas, 07-CR-543 (DLI)

Your Honor:

Mr. Defreitas was convicted after trial of the six counts contained in the above-captioned indictment. All counts related to a conspiracy to attack JFK airport. Mr. Defreitas is scheduled to be sentenced on February 17, 2011, at 9:30 a.m.

The recommended sentence under the guideline calculation is life imprisonment. This calculation is driven in large part by a sentencing enhancement, U.S.S.G. §3A1.4, that runs afoul of the statutory sentencing scheme set forth in 18 U.S.C. §3553. As such, we believe that the sentencing guidelines, as applied, lend little guidance to the Court in determining a reasonable sentence in this case. Accordingly, we respectfully request that the Court impose a non-guideline sentence of 15 years in this case to reflect the fact that Mr. Defreitas took no active role in bringing the conspiracy to fruition until the involvement, and at the urging, of the government and its informant. Until the government and its informant became involved, Mr. Defreitas was nothing but talk. Even after the involvement of the government, Mr. Defreitas' actions consisted of providing stale information about JFK airport.

## I. THE TERRORISM ENHANCEMENT UNDERMINES THE SENTENCING SCHEME SET FORTH IN 18 U.S.C. §3553.

We are mindful of the Court's responsibility to initially consider the United States Sentencing Guidelines in determining an appropriate sentence for Mr. Defreitas. The guidelines in this case are driven in large part by guideline §3A1.4, the terrorism enhancement. This guideline impermissibly undermines the Court's statutory duty to conduct an individualized inquiry into each defendant. As such, the guideline provides little meaningful guidance to this Court with respect to an appropriate sentence. Instead, for the reasons discussed in this sentencing submission, we believe that a sentence of 15 years is sufficient but not greater than necessary to achieve the goals of sentencing here.

United States Sentencing Guidelines (U.S.S.G.) §3A1.4 directs that a sentencing Court increase a defendant's criminal history score to Criminal History Category VI, the

Case 1:07-cr-00543-DLI   Document 496   Filed 01/24/11   Page 2 of 13

maximum category applicable category under the guidelines, in all cases related to a federal crime of terrorism. The consequences for defendants sentenced under this guideline are both novel and draconian. Moreover, the guideline contradicts the sentencing scheme set forth in 18 U.S.C. §3553(a)(1), which requires the court to consider the individual "history and characteristics of the defendant" to arrive at a reasonable sentence.

Instead of considering the "history and characteristics" of individual defendants, U.S.S.G. §3A1.4 takes a "one size fits all" approach that applies equally to cases involving actual acts of terrorism as well as material support cases with no connection to specific terrorism related activities. In fact, this enhancement has no empirical basis and appears to be based solely on speculative assumptions about terrorism defendants. This approach is particularly unfair to Russell Defreitas, a man with no significant criminal history and who had no operational capability to effectuate this conspiracy without the assistance of both foreign actors and the United States government. This section will discuss the operation of Mr. Defreitas's applicable guidelines in greater detail to demonstrate that U.S.S.G. §3A1.4 is violative of 18 U.S.C. §3553 and thus provides little meaningful guidance to Court.

### A. The statutory sentencing scheme.

Congress set forth a general sentencing scheme in 18 U.S.C. §3553(a)(2) which requires that a sentence be "sufficient, but not greater than necessary" to:

> A. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> B. to afford adequate deterrence to criminal conduct;
> C. to protect the public from future crimes of the defendant;
> D. to provide the defendant with needed educational or vocational training, medical care, or other corrective treatment in the most effective manner.

Additionally, 18 U.S.C. §3553(a)(1) requires the Court to consider "the history and characteristics of the defendant" in making an appropriate sentencing determination.

While the Supreme Court recognizes that the Guidelines should serve as "the starting point and the initial benchmark" for determining an appropriate sentence, it does not mandate a dogged adherence to them or even that courts consider the guidelines presumptively reasonable. See United States v. Fernandez, 443 F.3d 19, 27 (2d Cir. 2006) (declining to establish "any presumption, rebuttable or otherwise, that a Guidelines sentence is reasonable."). Consequently, even "a sentence outside the Guidelines carries no presumption of unreasonableness." Irizarry v. United States, 553 U.S. 708 (2008). Instead, "the Guidelines are only one of the factors to consider when imposing sentence ..." United States v. Gall, 128 S. Ct. 586, 602 (2007). Additionally, the Court need not find "extraordinary" circumstances to determine whether a downward departure or non-guidelines sentence is reasonable. Gall at 128 S. Ct. 596.

2

Case 1:07-cr-00543-DLI   Document 496   Filed 01/24/11   Page 3 of 13

Courts have recognized the wisdom of the guidelines because, in general, it is the Sentencing Commission and not the courts that "has the capacity courts lack to 'base its determinations on national experience, guided by professional staff with appropriate expertise.'" Kimbrough v. United States, 128 S. Ct. 558, 574 (2007). However, in cases where the Commission promulgates guidelines with no empirical basis, no such deference is owed. Accordingly, in cases where courts determine that the Sentencing Commission "did not take into account of 'empirical data and national expertise,'" a downward departure is appropriate. See Kimbrough at 576 (affirming that court's determination that the "crack/powder" cocaine disparity in the guidelines yields a sentence 'greater than necessary' to achieve §3553(a)'s purpose.)

Recently, the Second Circuit Court of Appeals took this approach one step further. In United States v. Dorvee , 604 F.3d 84 (2d Cir. 2010), the Second Circuit Court of Appeals held that a within guidelines sentence was substantively unreasonable in the context of the child pornography guidelines. In so holding, the Court noted the unique dangers inherent in working with a guideline "that is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what §3553 requires. Dorvee, 604 F.3d at 95. Specifically, the Court expressed concern that the guideline in question, §2G2.2, was not developed "using an empirical approach based upon data about past sentencing practices." Id. The Court then went on to observe that the Sentencing Commission is "an agency like any other" and "deference to the Guidelines is not absolute or even controlling." Dorvee, 604 F.3d at 97.

Together, these cases make clear that courts should not assume that any of the Guidelines are presumptively reasonable. In this case, the requirement that courts consider all terrorism defendants in Criminal History Category VI plainly violates the Court's statutory duty to conduct an individual inquiry into the nature and circumstances of each defendant. Here, we ask the Court to question the rationales underlying the terrorism enhancement. Such an inquiry makes clear that this enhancement lacks an empirical basis and is, instead, constructed upon unfounded assumptions about the nature of terrorism defendants.

**B. The terrorism enhancement lacks an empirically sound rationale.**

As with the guideline at issue in Dorvee, the terrorism enhancement is based on unprincipled assumptions about recidivism that are unsupported by empirical evidence or upon meaningful data about past sentencing practices. As with the guideline at issue in Dorvee, the terrorism guideline is fundamentally different from other guidelines. Unlike other guidelines, it directs a Court to manipulate a defendant's criminal history *even if the individual defendant has no prior criminal history.* Accordingly, a similarly careful analysis of guideline §3A1.4 makes clear that the terrorism enhancement is based upon empirically unsound assumptions.

In United States v. Meskini, 319 F.3d 88, 92 (2003), a petitioner argued that increasing a defendant's criminal history score and base offense level simultaneously amounted

to impermissible double counting. In rejecting this argument, the Second Circuit observed, without analysis, that,

> Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and, thus, that terrorists and their supporters should be incapacitated for a longer period of time. Thus, the terrorism guideline legitimately considers a single act of terrorism for both the offense level and criminal history category. United States v. Meskini, 319 F.3d 88, 92 (2003).

To be clear, we do not argue that the terrorism enhancement is illegal because of impermissible double counting. Instead, we submit that the guideline impermissibly undermines the Court's statutory duty to conduct an individual inquiry into the history and circumstances of defendants. Impermissibly raising the criminal history scores of defendants will lead the Court to hand down sentences that violate the parsimony clause of §3553, which requires that courts impose sentences that are "sufficient but not greater than necessary" to achieve the goals of sentencing.

Nevertheless, we dispute the Second Circuit's observation that there is indeed a rational basis for the terrorism enhancement. Upon information and belief, there is no published statistical data demonstrating that defendants convicted of any anti-terrorism statutes are more likely to be recidivists than any other first offenders. See James P. McLoughlin Jr. Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support, 28 Law & Ineq 51, Winter 2010 ("There is no published statistical data demonstrating that defendants convicted of violating 18 U.S.C. §2339B, 2339C, or other anti-terrorism statutes ... are any more likely to be recidivists than any other first offenders."); citing Ctr. On Law and Sec., Terrorist Trial Report Card: U.S. Edition 3 (2006), at 307 http://www.lawandsecurity.org/publications/ttrccomplete.pdf (noting the relatively minimal usage of the statute and the lack of substantive data on collective characteristics of offenders). Moreover, we have been similarly unable to identify any reliable data in the legislative history of U.S.S.G. §3A1.4 to suggest that persons convicted of terrorism-related offenses are more likely than other criminals to recidivate.

The Second Circuit's own cursory treatment of the rationale for this guideline is similar to the cursory rationale it rejected in Dorvee. The Court merely concludes that the rationale underlying the terrorism enhancement is rational without more. The Court's observation fails to acknowledge that the terrorism enhancement lacks any empirical basis. Moreover, this cursory rationale fails to acknowledge that the terrorism enhancement is fundamentally different from other guidelines.

U.S.S.G. §3A1.4 is novel amongst other sentencing guidelines in that it manipulates the criminal history category of defendants even if they have no prior criminal history. While there are other guidelines provisions that manipulate criminal history categories, these guidelines involve repeat offenders who have at least some criminal history in their past.

4

Case 1:07-cr-00543-DLI   Document 496   Filed 01/24/11   Page 5 of 13

Compare §3A1.4 with the familiar "career offender" guideline, U.S.S.G. §4B1.1, which requires that Courts sentence defendants in Criminal History Category VI when they have committed a felony that is either a crime of violence or a drug offense, and has had at least two prior felony convictions of either a crime of violence or a drug offense. See also, §4B1.4 ("armed career criminals" are Category IV at minimum); §4B1.5 ("repeat and dangerous sex offenders" are Category V at minimum).

Unlike the terrorism enhancement, the career offender guideline's criminal history manipulation is moored to the demonstrated criminal history of a particular defendant. For this guideline to apply, a defendant must have two prior felony convictions and those felonies must be crimes of violence or drug offenses. Moreover, for the guideline to apply, the instant crime for which the defendant is being sentenced must also be a crime of violence or a drug offense. In theory, these are cases of clear recidivism. Accordingly, the criminal history manipulation is appropriate since the guideline is merely recognizing the unique recidivist tendencies of an, at least, three time offender who has committed similar crimes in the past. Alternatively, the terrorism enhancement is the only guideline that manipulates criminal history even when a defendant has no prior criminal history. Unlike the other guidelines, the directive to increase a defendant's criminal history has no nexus to the individual characteristics of that defendant.

§3A1.4 has no demonstrable empirical link to recidivism, both with respect to an individual defendant and to terrorism defendants in general. There is no empirical data to support the notion that terrorism defendants are less successful candidates for rehabilitation. Instead, the rationale for manipulating a defendant's criminal history score is based solely on unsupported assumptions about the nature of terrorism defendants. Like the guidelines for crack/powder cocaine sentencing and child pornography cases, this terrorism enhancement is constructed upon a questionable empirical pedigree.

### C. The terrorism enhancement runs contrary to the Court's duty to consider the individual nature and circumstances of Mr. Defreitas.

The terrorism enhancement requires courts to consider all terrorism defendants in the same criminal history category, regardless of the actual criminal histories of individual defendants. This policy clearly runs afoul of the parsimony clause of 18 U.S.C. §3553(a), which requires that a defendant be evaluated individually to justify his or her sentence. Even the text of the Guidelines themselves suggest that this Court should conduct a more particularized inquiry into Mr. Defreitas' individual criminal history to determine whether a downward departure or a non-guidelines sentence is appropriate.

U.S.S.G. §4A1.3 provides that a Court may downwardly depart "if reliable information indicates that a defendant's criminal history category substantially over-represents the seriousness or the likelihood that the defendant will commit other crimes." Within the context of the terrorism enhancement, the Second Circuit has held that,

5

Case 1:07-cr-00543-DLI   Document 496   Filed 01/24/11   Page 6 of 13

A judge determining that §3A1.4(b) over represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' always has the discretion under §4A1.3 to depart downward at sentencing. Meskini, 319 F.3d at 92.

Moreover, this guideline is unique from many other guidelines that manipulate criminal history in that there is no restriction to the application of §4A1.3 to the terrorism enhancement. For example, §4A1.3 prohibits a downward departures for armed career criminals and repeat sex offenders. It similarly limits downward departures to one category at most for career offenders. See U.S.S.G. §§ 4A1.3 (b)(2) and (3). From this, we can conclude that, "without any prohibition or limitation, it is clear that the Commission did not intend to restrict a court's discretion with respect to criminal history downward departures under §3A1.4." United States v. Benkahla, 501 F. Supp. 2d 748, 759 (E.D.Va 2007).

We do not suggest that terrorism related offenses are not serious offenses. We recognize that the government has a solemn duty to vigilantly monitor and prosecute terrorism cases. Nevertheless, the seriousness of terrorism related offenses should not justify abandoning the measured approach and principles that are the hallmark of the American criminal sentencing scheme. We ask the Court to recognize that the federal criminal terrorism enhancement is a departure from these principles. As such, we ask the Court to follow the framework set forth in 18 U.S.C. §3553 and consider Mr. Defreitas' individual characteristics and the individual circumstances of this case to determine an appropriate sentence.

## II. THE COURT SHOULD ANALYZE MR. DEFREITAS' CASE PURSUANT TO THE SENTENCING SCHEME SET FORTH IN 18 U.S.C. §3553.

Pursuant to the holding of United States v. Booker, 543 U.S. 220 (2005), the Court is required to consider the sentencing guidelines as just one of the sentencing factors enumerated in 18 U.S.C. §3553(a).  18 U.S.C. §3553(a) requires the Court to consider those sentencing factors and then impose a sentence sufficient, but not greater than necessary, to comply with the goals of sentencing set forth in §3553(a)(2).  Accordingly, we analyze each of these factors in turn.

### A. 18 U.S.C. §3553(a)(1).

Pursuant to this factor, the Court is required to consider the nature and circumstances of the offense and the history and characteristics of Mr. Defreitas.

#### 1. The nature and circumstances of the offense.

The offenses detailed in the indictment comprise a conspiracy to attack JFK airport. Mr. Defreitas was part of a conspiracy of individuals in Guyana who claimed they wanted to attack JFK airport for various reasons. In numerous recorded conversations, Mr.

6

Defreitas stated that he was involved because of his belief that Muslims were being harmed worldwide by the actions of the United States, that he had been badly treated while working at JFK airport, and because he believed he could earn a great deal of money by revealing his inside knowledge of the airport layout and operations. However, it is clear that until the government and its informant, Steven Francis, entered the conspiracy, Mr. Defreitas did nothing but talk.

Donald Nero testified at trial that Mr. Defreitas allegedly discussed ways to get individuals into the United States and blow up planes early in 2006, in Guyana, with an individual referred to as "Ponytail" or "Longhair." Nero testified that Mr. Defreitas then brought the plan to him. As part of the plan, Mr. Defreitas was to return to the United States and recruit individuals to participate in the conspiracy. Tr. p.2491[1]. Mr. Defreitas returned to the United States in February 2006, but once back in the United States, no evidence was presented that Mr. Defreitas made any effort to recruit anyone.

The government then sent their informant, Steven Francis, to make Mr. Defreitas' acquaintance in July 2006. Mr. Francis made the acquaintance and then began to help Mr. Defreitas and talk about going into business with him. Mr. Francis drove Mr. Defreitas all over Queens helping him collect donations and barrels to ship items back to Guyana. Mr. Francis took Mr. Defreitas to shop and investigate sending essential oils and soaps back to Guyana. During these rides the men talked about the Middle East, the wars in Iraq and Afghanistan, and the mistreatment of Muslims. Eventually Mr. Defreitas invited Mr. Francis to come to Guyana for Ramadan and told Mr. Francis that he was involved in a mission. Mr. Defreitas then introduced Mr. Francis to Nero and Ponytail over the telephone, and Mr. Francis began having separate conversations with them. Nero especially began to ask Mr. Francis for things, including accompanying his wife on her return to Guyana for Ramadan, and helping her get her passport. Tr. p.3328-47.

Once in Guyana, Mr. Francis met Ponytail and Nero and learned more about the conspiracy and what had become a conspiracy to attack JFK airport. Another individual, Talib Rutherford, entered the conspiracy, and meetings began to be held at his office. Abdul Nur also became part of the conspiracy when the individuals began to talk about traveling to Trinidad to meet Abu Bakr who would hopefully lead them to Adnan Shukrahjumah, an Al Qaeda operative supposedly in Trinidad who Nero claimed to know. The conspirators believed the Adnan Shukrahjumah would bring their conspiracy to fruition. It became clear, however, that the individuals in the conspiracy, other than Rutherford, also did nothing more than talk. The others attended scheduled meetings sporadically, and no one took any action to bring the conspiracy to fruition. These individuals also talked a great deal about setting up a business arranging the export of goods from Guyana to the United States. Mr. Francis returned to the United States at the end of Ramadan with no set plans having been made, other than Rutherford's goal having the plot go forward by Christmas Eve. Mr. Defreitas remained in Guyana. Tr. p.3370-91.

---

[1]Tr. refers to the trial transcript page.

Case 1:07-cr-00543-DLI   Document 496   Filed 01/24/11   Page 8 of 13



Mr. Francis then began to work on that project. He communicated with the individuals in Guyana over the phone and told them that he was working on setting up the export business. He also pressed them to find out when Mr. Defreitas would return to the United States so they could work on the "shining light," the code name given to the conspiracy. Mr. Defreitas made it clear that he did not have the money to return to the United States, had no place to live, and was concerned about leaving Guyana while he had lawsuits pending. Mr. Francis arranged for Rutherford to pay for Mr. Defreitas to travel back to the United States and to take care of any necessary work in his lawsuits while he was away. Mr. Francis then told Mr. Defreitas that he had arranged for Mr. Defreitas to stay in a relative's apartment in New York City. With all the arrangements having been taken care of, Mr. Defreitas agreed to come back to New York. Tr. pp. 3393-97, 3408-09, 3413-19.

Mr. Francis then drove Mr. Defreitas to JFK airport so that Mr. Defreitas could show him the layout. Once at the airport, it became clear that Mr. Defreitas' knowledge of the airport was stale, and that he had no special access to any restricted areas. The recordings of Mr. Defreitas and Mr. Francis while driving at the airport make it clear that many access roads had been closed or restricted since Mr. Defreitas had last been to the airport, and at no time did Mr. Defreitas claim to have any pass or friend who would give him access to those closed or restricted areas. GX50, 204-213, 229.

Mr. Francis then took Mr. Defreitas to buy a video camera to record pictures of the airport. Mr. Defreitas did not offer to pay for the video camera, had no knowledge of where to buy a video camera, and had no idea how modern digital video cameras worked. This was further borne out in the recordings made from the trip to JFK airport to make a videotape. Mr. Defreitas could not turn the camera off or on and did not understand that he could view what he was recording as he recorded it on the viewing screen. The only thing Mr. Defreitas could do was direct Mr. Francis, on public roads, to see fuel tanks and airplane holding areas, all of which are visible to the general public from various locations at the airport. GX50, 204-213, 229.

Once the videotape recording was made, Mr. Defreitas and Mr. Francis returned to Guyana. Although Mr. Defreitas boasted about his video, and all involved in the conspiracy supposedly cheered while watching it, the conspiracy still did not move forward. The individuals began to have disputes amongst themselves as to who would go to Trinidad to meet with Abu Bakr or Adnan Shukrahjumah, and no one except Rutherford claimed to be willing to pay for the trip. After learning that Abdul Nur had been lying about having travel documents, Rutherford withdrew his backing, Nero and Mr. Francis and Mr. Defreitas fell out, and Ponytail disappeared. Tr. p.3523-33.

8

Case 1:07-cr-00543-DLI   Document 496   Filed 01/24/11   Page 9 of 13

Mr. Francis and Mr. Defreitas began to look for others to get involved. At this point, Mr. Defreitas had no money to pay for his trip back to New York. They met an individual, Sheik Wahab, who thought that Abdul Kadir might be interested in their scheme, and he took them to see Abdul Kadir. The men met with Abdul Kadir, who in effect ridiculed their video and told them to try Google Earth, but agreed to talk to others who might be interested in the conspiracy. Mr. Francis and Mr. Defreitas returned to New York, but Mr. Defreitas had to borrow money to do so, money which he was never in a financial position to repay. Tr. p.3534-36.

Once back in New York, Mr. Francis got a computer and began to look for JFK airport on Google Earth. He did this in the apartment he had given to Mr. Defreitas, but Mr. Defreitas was no help to him in using the computer or making the map. Mr. Defreitas again could not afford to travel to Guyana again, and made no effort to do so, until a government informant, an individual named Mohammed, offered him his tickets for free. Tr. pp.3339-42, 3550-53.

Mr. Defreitas and Mr. Francis returned to Guyana, and Mr. Francis went to stay with Abdul Kadir's son in Linden, and began to plan how to approach Abu Bakr. Mr. Defreitas stayed in Georgetown until the plans were set to travel to Trinidad. Once in Trinidad, Mr. Defreitas became scared of meeting with Abu Bakr, and quickly turned to the man they were staying with, Kareem Ibrahim, as an alternative. Mr. Defreitas, for all his continued talk about the conspiracy, decided to leave the video and all the other information he had with Kareem Ibrahim, and return to New York. Again, Mr. Francis was the one, who, when they were back in New York, spoke with all of the co-conspirators, and got information about the plan of Kareem Ibrahim and his people to take the plan to Iraq. The times when Mr. Defreitas was included in these conversations, he was basically just listening in. GX 230, 226, Tr. p.3568-3594

Mr. Defreitas' actions throughout this conspiracy showed him to be a man who was all talk and no action. All actions in this case were initiated by others, and Mr. Defreitas was along for the ride. He paid no money to further this plot and scuttled the plot at the moment when the conspirators were to meet with Abu Bakr and finally move things forward. The only action Mr. Defreitas undertook was to show JFK airport to Mr. Francis, and he did it at the instigation of the Government. While Mr. Defreitas "videotaped" the airport, it is clear that he could not even turn the video camera on without Mr. Francis' help. The recordings of these trips to JFK make it clear, however, that Mr. Defreitas saw this as an opportunity to boast about how much he knew and to aggrandize himself, more than move forward any plot. What the trips to JFK really showed, however, was how stale Mr. Defreitas' knowledge about the airport was.

All of the recordings presented by the Government detail Mr. Defreitas' inflated opinion of himself. Egged on by Mr. Francis, Mr. Defreitas' stories about how to attack JFK grew and grew. His claims about how they would accomplish the plot became more and more ridiculous until they finally rose to the level of the absurd, with Mr. Defreitas' scheme to send "ninjas" in to attack the airport.

9

Case 1:07-cr-00543-DLI   Document 496   Filed 01/24/11   Page 10 of 13

### 2. The history and characteristics of Mr. Defreitas.

Mr. Defreitas's personal history is one quite at odds with his involvement in this offense. He was raised in a happy home, with close relationships with his mother and his siblings. He has been married and involved in several long term relationships as an adult, and has three children, although he has no real relationship with any of his children. Mr. Defreitas lost contact with the children from his marriage when his wife left him and took their children. Mr. Defreitas did not learn that he had a third child until that child was almost an adult, and at that point, the child did not wish to have a relationship with Mr. Defreitas.

Mr. Defreitas' employment has been limited by his inability to learn to read and write, but he was able to maintain long term steady employment as a general laborer, an elevator operator, a jazz musician, and as a cargo loader at JFK airport. In 1993 Mr. Defreitas was disabled in a car accident and began to receive Social Security disability benefits, which he continued to receive until his arrest.

### B. 18 U.S.C. §3553(a)(2).

The Court is next required to consider the following four factors in determining the need for the sentence imposed to (A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational, or vocational training, medical care, or other correctional treatment in the most effective manner.

### 1. A sentence to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense.

A sentence of fifteen years in custody, the maximum sentence for providing material support for terrorism, would be a sentence that reflected seriousness of the offense, promoted respect for the law, and provided just punishment for the offense. As noted above, Mr. Defreitas was all talk and no action in this conspiracy until the Government became involved. Once the Government did become involved, Mr. Defreitas' actions consisted of telling people about the layout of JFK airport, driving the government informant around JFK airport, videotaping the airport (although for this he needed an extraordinary amount of assistance) and then describing what was on the video. Thus his offense conduct, rather than the offenses of conviction, was more like 18 U.S.C. §2339A, providing material support to terrorists. 18 U.S.C. §2339(b)(1) defines material support to terrorists as providing expert advice, and expert advice is defined as including advice or assistance from specialized knowledge. Mr. Defreitas' actions were, in effect, providing expert advice about the airport, based on his specialized knowledge (although in reality, his knowledge at that point was stale) to people who would take that information to terrorists. A sentence of 15 years would reflect the seriousness of his offense and

10

provide just punishment for the offense, consistent with the maximum sentence set forth in 18 U.S.C. §2339A. The sentence would promote respect for the law because it would justly punish the actual offense conduct involved.

### 2. A sentence to adequately deter criminal conduct.

A sentence of 15 years for Mr. Defreitas' actions of talking about and videotaping JFK airport will serve as a general deterrent in keeping the public from committing similar criminal acts.

### 3. A sentence to protect the public from any future crimes on the part of Mr. Defreitas.

Mr. Defreitas is 67 years old, and will likely serve his sentence in a maximum security prison if not a supermax prison. He has been under SAMS conditions since his arrest in 2007, which keep him relatively isolated and alone, and he will likely continue to serve under these conditions. The likelihood of his being released alive from a sentence of 15 years under these conditions is minimal and thus will deter any further criminal conduct on his part. If Mr. Defreitas does survive to be released, he will be close to 80 years old, and his ability to commit any further crimes will be greatly reduced. A sentence of 15 years will thus protect the public from any further crimes on the part of Mr. Defreitas.

### 4. A sentence to provide needed educational, vocational, or medical treatment.

There is no need to impose a specific sentence to provide educational, vocational, or medical treatment, although Mr. Defreitas will need continued medical treatment while in custody.

### C. 18 U.S.C. §3553(a)(3).

The Court must next consider the kinds of sentences available. Count Two carries a mandatory minimum sentence of five years in prison, although this is well below the sentence of 15 years the defense is requesting.

### D. 18 U.S.C. §3553(a)(4).

The Court must next consider the applicable guideline sentence. For reasons, previously discussed, we believe that the applicable terrorism enhancement impermissibly runs afoul of the Court's sentencing responsibilities under §3553. Although the application of Guideline §2A1.5 may be the guideline most analogous to the offenses of conviction, we do not believe that it is the guideline most analogous to Mr. Defreitas' offense conduct.

11

We believe the Court should focus on Mr. Defreitas's actual conduct and actual criminal history at sentencing. Given that Mr. Defreitas' actual conduct consisted of providing material support to individuals he believed wanted to attack JFK airport, using guideline U.S.S.G. §2M5.3, providing material support for a terrorist purpose, achieves a sentence that appropriately punishes Mr. Defreitas' actual conduct. Mr. Defreitas' guidelines would then be as follows:

| | |
|---|---|
| Base offense level: | 26 |
| Specific enhancement (b)(1)(E): | |
| (for the knowledge that his information would be used to commit a violent act) | +2 |
| Role adjustment | |
| (for supervising Mr. Francis in traveling through and videotaping JFK airport) | +3 |
| Total offense level: | 31 |

In Criminal History Category I, this offense carries a guideline range of imprisonment of 108 to 135 months.

### E. 18 U.S.C. §3553(a)(5).

The Court must next consider whether there are any pertinent policy statements issued by the sentencing commission that would affect Mr. Defreitas's sentence. There are none.

### F. 18 U.S.C. §3553(a)(6).

The Court must next consider the need to avoid unwarranted sentencing disparity among defendants with similar records who have been found guilty of similar conduct. A sentence of 15 years in custody, although higher than what the defense believes is the appropriate guideline sentence, would be similar to that received by Abdul Nur. Mr. Defreitas' offense conduct is similar to that of Abdul Nur. Mr. Defreitas only took action at the behest of the government, and showed no indication or ability to take action on his own. This is similar to the way that Mr. Nur could not obtain travel documents or make his own travel arrangements without Mr. Francis and the government's assistance. Mr. Defreitas was boastful in his talk about JFK airport, the way Abdul Nur was in his claims to be connected to Abu Bakr. In the end, Mr. Defreitas could only provide stale information about JFK airport, the way Abdul Nur could only arrange a meeting with Abu Bakr, and not get him involved in the offense on his own, despite his claims of close ties.

A sentence of 15 years would be dissimilar to that received by Mr. Defreitas' co-defendant, Abdul Kadir, but the case at trial showed that Mr. Defreitas' and Mr. Kadir's actions were dissimilar. Rather than simply being a boastful talker, Abdul Kadir had the contacts who had the capacity to take action to bring the plot to fruition. Abdul Kadir may, in fact, have been taking action to further the plot at the time of his arrest by getting on a plane headed to Iran. A sentence of 15 years, although dissimilar from that imposed upon Abdul Kadir who was

12

convicted of the same conduct, would be more appropriate in Mr. Defreitas' case given his lack of action without government intervention and assistance.

### G.  18 U.S.C. §3553(a)(7).

The Court next needs to determine if there are any victims in the case requiring restitution.  There are none.

### III.  CONCLUSION

We respectfully request that the Court impose a non-guideline sentence of 15 years in custody, which would reflect that Mr. Defreitas, no matter how ugly his talk, took no action in this conspiracy prior to the involvement of the Government and its informant. Once the Government became involved, Mr. Defreitas' actions still consisted of nothing more than ugly talk and an explanation and a videotaping of the layout of JFK airport from public areas within JFK airport.  A sentence of 15 years is sufficient, but not greater than necessary to achieve the goals of sentencing.

Sincerely,

Mildred M. Whalen
Len H. Kamdang
Staff Attorneys
(718) 330-1200

enc.

cc:     Assistant U. S. Attorney Marshall Miller, Esq.
        Assistant U.S. Attorney Jason Jones, Esq.
        Assistant U.S. Attorney Zainab Ahmad, Esq.

        U.S. Probation Officer Frank M. Marcigliano

        ECF

13