

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

MLM:JAJ:ZA  *271 Cadman Plaza East*
F.#2006R00688  *Brooklyn, New York 11201*

February 2, 2011

BY HAND AND ECF

The Honorable Dora L. Irizarry
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

       Re:  United States v. Russell Defreitas
            Criminal Docket No. 07-543 (DLI)

Dear Judge Irizarry:

      The Government respectfully submits this letter in connection with the defendant's sentencing, scheduled for February 17, 2011.  For the reasons set forth below, the Court should sentence the defendant to a life term of imprisonment as called for by the United States Sentencing Guidelines (hereinafter, "USSG" and the "Guidelines").  Such a sentence will constitute just punishment and reflect the extraordinarily serious nature of the defendant's terrorist offenses.

I.       The Applicable Range Under the Sentencing Guidelines Is Life in Prison

      By statute, in sentencing a defendant, the Court "must consider the Guidelines," along with the other factors listed in 18 U.S.C. § 3553(a).  United States v. Crosby, 297 F.3d 103, 113 (2d Cir. 2005).  Generally, such consideration requires a determination of the applicable Guidelines range.  Id.  Even after the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), the Guidelines continue to play a critical role in sentencing.  "The [G]uidelines cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges." United States v. Rattoballi, 452 F.3d 127, 133 (2d Cir. 2006) (omitting internal quotations).

2

In the instant case, as a result of the defendant's leadership role in a terrorist plot that he formulated to detonate explosives at John F. Kennedy International Airport ("JFK Airport"), the Guidelines offense level is 49, and the applicable criminal history category is VI. See Presentence Report ("PSR"), ¶¶ 75-98. The corresponding Guidelines range is a term of imprisonment of life. Id. at ¶ 129. In arguing for a lesser sentence, the defendant contests the application of the terrorism enhancement, USSG § 3A1.4, suggests that the Court should apply a different offense Guidelines section than that identified by the PSR and contends that no role adjustment is warranted. The defendant's arguments lack merit.

    A.    The PSR Correctly Identifies the Applicable Offense Guideline Section

Despite the fact that the defendant did not object to the PSR's identification of USSG §§ 2K1.4(c)(1) and 2A1.5 as the applicable offense guideline sections, see PSR, ¶¶ 36-46, in either of his letters to Officer Marcigliano of United States Probation, he now suggests in his sentencing letter that the Court should instead employ USSG § 2M5.3, the Guidelines section associated with the crime of providing material support for a terrorist purpose. The Guidelines clearly indicate that the PSR is correct and the defendant incorrect.

As set forth in the PSR, the offense section assigned by the Guidelines to the statutes that the defendant was convicted of violating and conspiring to violate is USSG § 2K1.4. See USSG, § 2K1.4, Commentary; USSG, Appendix A. Section 2K1.4(c)(1), in turn, directs the Court, where "the offense was intended to cause death or serious bodily injury," to apply the most analogous guideline section from Chapter Two, Part A if application of that Guidelines section results in a greater offense level. USSG § 2K1.4(c)(1). Because the defendant and his coconspirators conspired to murder scores of innocent people, see, e.g., Trial Transcript, 2496, 2514 (discussing the intended loss of lives), Government Trial Exhibit ("GE") 211T, at 7 (capturing Defreitas stating that only a few people will escape the explosion of JFK Airport), there can be no dispute that the applicable offense section from Chapter 2, Part A is USSG § 2A1.5, Conspiracy or Solicitation to Commit Murder.

The defendant's contention that the appropriate Guidelines section is USSG § 2M5.3 is baseless. First, it flies directly in the face of the text of the Guidelines; as set forth above, USSG § 2K1.4(c)(1) directs the Court to Chapter Two, Part A – not Part M. Second, the defendant's conduct is far more

3

analogous to conspiracy to murder than the provision of material support.  After all, the jury convicted the defendant of, inter alia, conspiring to detonate an explosive at JFK Airport "with the intent to cause death, serious bodily injury and extensive destruction," Indictment, Count One, and the defendant himself was recorded stating that the terrorist attack he conceived and pursued would be more devastating than the 9/11 attacks, see GE 224T, at 41.  As a result, the Court should apply USSG § 2A1.5 as set forth in the PSR.

    B.    The Defendant's Participation in the Offense Warrants a Four-Point Upward Role Adjustment

The PSR assesses a four-point role enhancement for defendant Defreitas, finding that he was an organizer and leader of the instant offense, and that he "coordinated, organized, managed and was involved in every aspect of the planning of the conspiracy, which involved five or more participants."  PSR, ¶ 48, 84.  In a letter to Officer Marcigliano, the defendant objected to the PSR's role assessment.  Because the evidence presented at trial established that defendant Defreitas was an organizer and leader of the conspiracy, the defendant's objection should be overruled.

The Guidelines direct that in determining whether a defendant qualifies for an upward role adjustment, courts should "consider the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, . . . the degree of participation in planning or organizing the offense [and] the nature and scope of the illegal activity," among other factors.  U.S.S.G. § 3B1.1 app. note 4.  Here, there can be no doubt that the plot to attack JFK Airport was Russell Defreitas's brainchild and that he was involved in every aspect of its planning.  Almost every participant (or purported participant) in the plot was recruited by Defreitas, including Nero, Rutherford, Francis, Wahab, Kadir and Ibrahim.  Though he would often solicit advice from others on technical aspects of the plot, which he candidly admitted were outside the scope of his expertise, he answered to noone in deciding whom to recruit and solicit in order to best advance the plot to fruition.  See, e.g., GX 227T, at 8 (Defreitas informing Kadir that he had unilaterally made the decision to present the plot to Ibrahim).  As a result, the PSR correctly imposed a four-point enhancement for the defendant's leadership role.

4

C.   <u>The PSR Correctly Applies the Terrorism Enhancement</u>

The Probation Department correctly applied the terrorism enhancement, USSG § 3A1.4, which increases the defendant's offense level by 12 points and places the defendant in Criminal History Category VI. The defendant does not dispute that the enhancement is correctly applied to his conduct as a matter of law, but contends more broadly that it "undermines the sentencing scheme set forth in 18 U.S.C. § 3553." Def. Sent. Letter, at 1. In particular, the defendant argues that the enhancement's placement of all terrorism defendants in Criminal History Category VI is unfair and not based on sufficient empirical data. <u>Id.</u> at 2-6. The defendant's argument lacks merit.

First, the defendant's argument is premised on a simple misunderstanding of the Guidelines and the sentencing procedures required by 18 U.S.C. § 3553. As the defendant concedes, even within the Guidelines scheme itself, the Court is not bound by the criminal history category imposed by the terrorism enhancement, but retains the authority to downwardly depart. <u>See</u> USSG § 4A1.3 (authorizing departures based on inadequacy of criminal history). Moreover, as set forth above, the Guidelines constitute but a single factor in the § 3553 analysis. After applying the Guidelines, the Court then must apply all of the other § 3553(a) factors to determine the appropriate sentence for the defendant. As a result, it is nonsensical for the defendant to contend that the terrorism enhancement violates § 3553, as application of the enhancement has no bearing on the Court's determination and balancing of the other § 3553 factors.

Second, based on the facts of this case, the defendant's complaint regarding the effects of the terrorism enhancement on his criminal history category is irrelevant.[1] Given the extreme seriousness of the defendant's criminal conduct, even if Criminal History Category I were applied, the Guidelines range would still be life in prison. Indeed, the defendant's total offense level of 49 is, literally, off the Sentencing Table chart, as it is six levels <u>above</u> the offense level that triggers a Guidelines sentence of life in prison no matter what the defendant's criminal history category.

---

[1] The defendant has not attacked the terrorism enhancement's application of a 12-point increase in the offense level. Nor could he. It would be unreasonable for the Guidelines <u>not</u> to assess a substantial offense level increase for a defendant's participation in terrorist activity.

Third, the gravamen of the defendant's argument has been rejected by the Second Circuit. In United States v. Meskini, 319 F.3d 88, 91 (2d Cir. 2003), the Second Circuit rejected a challenge to the terrorism enhancement's criminal history increase. In particular, the Circuit found that:

> Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time.

Id. at 92. While the defendant may wish to "dispute" the Second Circuit's finding, he has provided no case law or other basis for that dispute, other than his "information and belief" and citations to articles that contain no data. Def. Sent. Letter, at 4.

Finally, the very premise of the defendant's attack on the enhancement is deeply flawed. That attack relies exclusively on United States v. Dorvee, 604 F.3d 84, amended and superseded by 616 F.3d 174 (2d Cir. 2010). His reliance is misplaced. In Dorvee, the Second Circuit held that the 20-year sentence imposed upon a defendant convicted of a single count of distribution of child pornography was procedurally and substantively unreasonable. Id. at 176. In the relevant portion of the opinion, the Court found that 20 years in prison was a "manifestly unjust" sentence given the crime committed. Id. at 188. Moreover, in explaining why the sentence was substantively unreasonable even though it was a Guidelines sentence, the Court criticized the child pornography guideline, USSG § 2G2.2, as overly harsh and the product of direct Congressional drafting and manipulation, at times over the Sentencing Commission's objections, rather than the Commission's careful judgment. Id. at 184-87.

Dorvee does not help the defendant. Unlike the sentence in Dorvee, a Guidelines sentence of life is anything but "manifestly unjust" for the exceedingly dangerous and serious crime of conspiring to commit a violent terrorist attack at JFK Airport intended to dwarf the 9/11 attacks and cause numerous innocent deaths. See, e.g., United States v. Jabarah, 292 Fed. Appx. 140, 142-43 (2d Cir. 2008) (unpublished opinion) (rejecting argument that life sentence was substantively unreasonable in case involving international terrorist conspiracy). Moreover,

6

unlike the child pornography guideline, the terrorism enhancement was not the product of Congressional drafting or manipulation. Indeed, while Congress directed the Commission to amend the Guidelines to provide for an enhancement for a felony involving terrorism, Congress left the structure, effect and terms of the enhancement to the Commission's careful judgment.  See Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796, § 120004 (1994).  In addition, the Commission's judgment, endorsed by the Second Circuit, that "even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation," Meskini, 319 F.3d at 92, is supported by logic, common sense and experience.  A proper understanding of the terrorist mindset and the stakes involved in averting terrorist recidivism, as well as academic study positing that, though data is limited, there is a trend towards recidivism among jihadist terrorists, see Dennis A. Pluchinsky, Global Jihadist Recidivism: A Red Flag, 31:3 Studies in Conflict & Terrorism 182, 182-89 (2008), all support the considered judgment of the Commission and the Circuit.

For the many reasons set forth above, the Court should reject the defendant's claim that the terrorism enhancement somehow conflicts with 18 U.S.C. § 3553.

D.  The PSR Correctly Assesses the Sentencing Range Under the Guidelines

Because the defendant's objections lack merit, the Court should adopt the Guidelines calculation set forth in the PSR.  The Guidelines range "should serve as 'a benchmark or a point of reference or departure'" in determining the sentence.  United States v. Fernandez, 443 F.3d 19, 28 (2d Cir. 2006) (quoting United States v. Rubenstein, 403 F.3d 93, 98-99 (2d Cir. 2005)).  For the reasons set forth below, a Guidelines sentence of life in prison will constitute just punishment for the defendant's extraordinarily serious criminal conduct.

II.  Application of Factors under 18 U.S.C. § 3553

A.  The Nature and Circumstances of the Offense Weigh Heavily in Favor of a Guidelines Sentence of Life in Prison

As the evidence demonstrated at trial, had defendant Russell Defreitas and his coconspirators succeeded in their efforts to bomb JFK Airport and its fuel tanks and pipelines, they would have caused massive harm – personal and economic – to

the United States, the City of New York and its residents and visitors.  It goes without saying that exploding bombs at one of the busiest airports in the world would have injured and killed scores of people.  Indeed, that was one of Defreitas's goals in devising and pursuing the terrorist plot.  Trial Transcript, 2496, 2514 (discussing the intended murder of people at the airport including "women, children [and] pregnant women").  The intent of defendant Defreitas to murder innocent civilians was captured on tape when Defreitas detailed the devastation he intended the attack to cause:

> It will take out the whole entire area, the whole of Kennedy will go up in smoke . . .  A few people [] might escape, but escape to where?  The Jamaica Bay?

GE 211T, at 7.  Indeed, part of Defreitas's plan was to ignite the fuel pipeline to spread the explosion beyond JFK Airport. See id.

In addition to the injuries and loss of life, defendant Defreitas intended the attack to cause severe harm to the economy of the United States and New York City by incapacitating one of the world's most important international transportation hubs.  GE 225T, at 33 (capturing Defreitas estimating that "for about a month the economy of America [will] go down.  Not New York, the whole [of] America, 'cause you're talking with the airport every 5 seconds a plane [is] landing").  The government proved at trial that the terrorist attack planned and relentlessly pursued by Defreitas would indeed have caused extensive economic harm. See Trial Transcript, 2399-2401 (indicating that JFK Airport handled 440,000 flights, 48 million passengers and 1.7 million tons of cargo in 2007).

In sum, defendant Defreitas was committed to perpetrating a terrorist attack of great magnitude, repeatedly indicating his fervent desire to outdo the 9/11 terrorist attacks.  See, e.g., GE 224T, at 41; GE 224T, at 49; 225T, at 33-34.  According to Defreitas, the terrorist attack that he planned and pursued "for years," GE 224T, at 49, would cause such devastation that "even the Twin Towers couldn't, can't touch it." Id. at 41.  It is hard to imagine conspiracy offenses of a more serious nature than the offenses of which the defendant stands convicted.

Moreover, the defendant played a leadership role in planning and pursuing this dangerous terrorist attack.  Starting in the 1990s, when he worked at JFK Airport, the defendant began

8

planning how to commit a terrorist attack. See GE 204T, at 3; 205T, at 20; 210T, at 2-3, 6; 211T, at 11. Consumed by anger at the United States about its foreign policy and his own personal treatment, see GE 204T, at 3; 210T, at 3; GE 211 T, at 11, Defreitas planned "for years" how to attack the airport. GE 224T, at 49; see also GE 205T, at 20 (describing his surveillance of the airport as continuing for years); GE 211T, at 11; GE 213T, at 6 (capturing Defreitas stating "I've been studying this thing a long time"). Defreitas crafted various strategies for using his insider knowledge to commit a terrorist attack at the airport, including using a mail bomb and smuggling a terrorist operative into the airport through a side entrance. PSR, ¶ 9; GE 210T, at 2-3. Ultimately, Defreitas settled on the plan to explode the fuel tanks and pipelines at the airport, because of the catastrophic impact of such an attack and the lack of security that he perceived in the fuel areas. See, e.g., GE 205T, at 8 (capturing Defreitas predicting that "as long as one of them tanks get hit: all gone"); GE 206T, at 3-4 (capturing Defreitas describing lack of security around fuel tanks).

In 2006 and 2007, Defreitas capitalized on his status as a naturalized United States citizen from Guyana to travel back and forth to the Carribean. For over a year, Defreitas relentlessly pursued the terrorist plot that he had conceived, successfully recruiting Donald Nero, Abdul Kadir, Kareem Ibrahim and other like-minded, would-be terrorists. He also identified potential sources of explosives (such as mine owner Talib Rutherford) and performed video reconnaissance of targets for attack and escape routes at JFK Airport. In a vivid demonstration of the intensity of his commitment to his violent goals, Defreitas pursued the Carribean's most notorious terrorist operatives, Adnan Gulshair el Shukrijumah of Al Qaeda and Yasin Abu Bakr of the Jamaat Al Muslimeen ("JAM"), as potential sources of support and terrorist expertise for his plot. Defreitas also identified means to secure and hide terrorist financing for the attack and ultimately engineered the planned presentation of the plot to Iranian revolutionary leadership. Throughout the conspiracy, the defendant repeatedly and emphatically expressed his desire and commitment to move the plot from a plan to a reality as quickly as possible. See GE 205T, at 2 (capturing Defreitas demanding to perform airport reconnaissance immediately); GE 211T, at 13 (capturing Defreitas expressing his desire to go to Trinidad to present the plot "immediately" and not to wait "like a cell"); GE 218T, at 3 (capturing Defreitas stating that he wanted to act as "early as possible"); GE 226T, at 12 (capturing Defreitas stating that "[w]e ain't got time to waste. . . Our mission is to see this accomplished").

9

In sum, based on the extraordinarily serious nature of the offense and the defendant's leadership role therein, a sentence of life in prison, as called for by the Guidelines, is warranted.

> B. The Court Should Reject the Defendant's Shameful Efforts to Shift Blame for His Crimes

In his sentencing memorandum, the defendant attempts to minimize his role in the plot by blaming the offense on the efforts of Steven Francis, the cooperating witness, and claiming that he did "nothing but talk." Def. Sent. Letter, at 7. Of course, as the Court is well aware, the defense presented these same arguments to the jury, which reviewed the evidence and rejected them.

The reason the jury rejected these claims is simple: the evidence definitively proved otherwise. First, as demonstrated by the trial testimony and the recordings admitted into evidence, Russell Defreitas personally formulated the plot and pursued it relentlessly for over a year, traveling to three countries to recruit conspirators, locate explosives, pursue terrorist operatives, perform reconnaissance of targets and identify terrorist financing. During numerous conspiratorial conversations recorded by law enforcement, Defreitas described how he had planned for years prior to meeting Steven Francis how to attack JFK Airport. See, e.g., GE 205T, at 20; GE 224T, at 49. Moreover, the recorded conversations captured how Defreitas served as the plot leader, consistently and without exception directing Francis's actions and even complaining that Francis never took initiative. See, e.g., GE 211T, at 10-11. Faced with an absence of inducement evidence and a wealth of predisposition evidence, defendant Defreitas did not even attempt to raise an entrapment defense at trial.

In his eleventh-hour effort to blame Francis for his own criminal acts, defendant Defreitas relies on inaccurate factual claims disproved by the evidence. For example, Defreitas argues that the conspirators did "nothing more than talk." Def. Sent. Letter, at 7. The evidence flatly contradicts this claim, and the jury rejected it. Among other acts in which the conspirators engaged, Defreitas identified and the conspirators pursued Shukrijumah, the Al Qaeda explosives expert, see PSR, ¶ 17, Trial Transcript, 2500-01; Rutherford sent Defreitas to New York to surveil JFK Airport, see PSR, ¶ 19; Defreitas engaged in video reconnaissance at JFK Airport on four separate occasions, see id. at ¶¶ 20-22; Defreitas recruited into the plot Iranian operative Abdul Kadir in Guyana and Kareem Ibrahim in Trinidad,

see id. at ¶¶ 26, 31-32; Kadir directed the plotters to locate satellite imagery of JFK Airport, see id. at ¶ 26; Abdel Nur presented the terrorist plot to Abu Bakr, the perpetrator of the Carribean's most notorious terrorist attack, see id. at ¶ 31; Defreitas and Ibrahim directed the presentation of the plot to revolutionary leadership in Iran, see id. at ¶ 32, GE 225T, at 20; Defreitas identifed a bank account in which to hide terrorist financing, see PSR, ¶ 33; and Kadir was arrested en route to Iran to present the plot, see id. at ¶ 34. Defreitas's argument that the plot was all talk and no action is belied by the evidence and should be rejected as readily by the Court as it was by the jury.

Defreitas further claims that, while in Trinidad, he "scuttled the plot." Again, the evidence flatly and unequivocally puts the lie to this claim. At the time that he claims he was "scuttling" the plot, Defreitas was instead pursuing an avenue that he believed was less likely to result in arrest and more likely to result in bombs exploding at JFK Airport. As the evidence proved, Defreitas came to believe that law enforcement scrutiny rendered Abu Bakr a dangerous terrorist partner, and he focused instead on pitching the plot to Iranian revolutionary leadership. See PSR, ¶¶ 31-32. After the point in time at which he now claims he "scuttled" the plot, Defreitas recruited coconspirator Ibrahim into the plot, see id. at ¶ 32; identified a bank account to hide terrorist financing, see GE 225T, at 17, 24-25; agreed that a conspirator with terrorist connections would travel to Iran to pitch the plot, see GE 225T, at 20; and stated that "[w]e ain't got time to waste. . . . Our mission is to see this accomplished," GE 226T, at 12. Days later, Abdul Kadir, a conspirator with connections to Iranian leadership, including Mohsen Rabbani, traveled to Iran to pitch the plot. See PSR, ¶ 34. For Defreitas to argue in the face of such evidence that he "scuttled" the plot not only strains credulity but borders on the absurd.

In sum, Defreitas's arguments regarding his role and involvement in the plot are not based on facts, but rather on mischaracterizations of the evidence presented at trial. As set forth above and in the PSR, Defreitas played a leadership role in the terrorist conspiracy that was his personal handiwork. The Court should not reward Defreitas's efforts at shifting the blame for his conduct onto the government's investigation with a non-Guidelines sentence.

C. <u>The Defendant's History and Characteristics Weigh Heavily in Favor of a Guidelines Sentence of Life in Prison</u>

As set forth in the PSR and as proved by the evidence presented at trial, the defendant has engaged in a history of criminal conduct, including welfare fraud, theft of property from JFK Airport and violent activity, including threats and small-scale bombings of public property in Guyana. In addition, over the previous 20 years, the defendant – by his own admissions – has engaged in consideration and planning of an assortment of terrorist acts.

First, evidence gathered during the investigation demonstrates that the defendant engaged in welfare fraud over a period of years, as well as theft of property from JFK Airport. After applying for and obtaining Social Security disability benefits,[2] the defendant engaged in welfare fraud by providing false information and documents to the Social Security Administration and working off the books, most recently as a painter in 2007. Govt. Letter to Officer Marcigliano, Nov. 10, 2010, at 3; PSR Addendum, at 1-2. In addition, during his tenure as a cargo worker and supervisor at JFK Airport, the defendant abused his position of trust by stealing property from the airport. PSR, ¶ 21.

Second, the defendant engaged in violent activity in addition to his leadership of the terrorist plot to attack JFK Airport. For example, in Guyana, years prior to his involvement in the instant terrorist offense, the defendant learned how to make improvised explosive devices during his participation in a militant movement in Guyana. <u>See</u> PSR, ¶ 21; GE 211T, at 11 ("Remember I was taught by other friends to make bombs in Guyana. And I working in these facilities [<u>i.e.</u>, JFK Airport], and I see

---

[2] Notably, in applying for benefits, the defendant represented to psychiatrists, doctors and the Social Security Administration that he had never suffered psychiatric problems prior to a May 1993 car accident, <u>see</u> Govt. Letter to Office Marcigliano, Nov. 10, 2010, at 2-3 & Exhibit A, but claimed to Probation that he has experienced lifelong depression and memory difficulties stemming from a childhood bicycle accident. PSR Addendum, at 1 (noting "disparities between the information provided by the defendant to the Social Security Administration in his application for disability benefits, and the information provided to the Probation Department, concerning the cause of his mental health problems").

all these loopholes, these things used to come into my brain that I could blow this place up. When I was a youth I could make a bomb."); Trial Transcript, 2796. The defendant put that bomb-making experience into practice in Guyana, where, together with others, he used improvised explosive devices in connection with small-scale bombings of public property. Trial Transcript, 3476-79. In addition, Defreitas threatened to shoot coconspirator Donald Nero when he dropped out of the plot to attack JFK Airport. PSR, ¶ 25; Trial Transcript, 2519.

Finally, as set forth in more detail above, before launching the charged terrorist conspiracy, the defendant spent years planning how to commit a terrorist attack at JFK Airport. GE 205T, at 20; GE 211T, at 11; GE 213T, at 6; GE 224T, at 49. Before settling on the plan to attack the fuel tanks and pipelines, Defreitas crafted various workable strategies for terrorist attack, including using a mail bomb and infiltrating the airport through a side entrance. PSR, ¶ 9. Moreover, during the course of the charged conspiracy, the defendant suggested additional targets for terrorist attack, including a Jewish synagogue and school. See, e.g., Transcript of Consensual Recording, attached as Exhibit A, at 7-8.

In sum, the defendant's history and characteristics clearly support a life sentence, as called for by the Guidelines.

D. A Guidelines Sentence of Life in Prison Would Reflect the Seriousness of the Offense, Promote Respect for the Law and Provide Just Punishment

There are few more serious offenses in the federal criminal code than plotting to commit a terrorist bombing against a public transportation system like JFK Airport. As set forth above, had the conspiracy achieved its objective, the consequences would have been extraordinarily severe: the death of numerous innocent victims, extensive injuries to other innocent people and a significant economic injury to New York City and the United States. Only a Guidelines sentence of life in prison would reflect the seriousness of the offense.

Any sentence below the Guidelines range would severely undermine respect for the law. The evidence at trial demonstrated the defendant's guilt beyond a reasonable doubt. Yet, in his sentencing submission, the defendant still attempts to shift blame to the government. Just as the jury rejected the defendant's false claims at trial, the Court should reject them at sentencing. A Guidelines sentence of life in prison would constitute the only just punishment for the offense.

13

E. <u>The Deterrence Factor Weighs in Favor of a Guidelines Sentence of Life in Prison</u>

The investigation and prosecution of this case represent a sterling example of how a proactive law enforcement strategy should work to fight terror within the federal criminal justice system: the identification of terrorist conspirators, an effective investigation yielding significant evidence and a successful federal criminal prosecution. To allow the defendant to escape just punishment by minimizing such significant criminal conduct would send the wrong message to those who might consider engaging in a terrorist plot in the future. As a result, the deterrence factor also supports a Guidelines sentence of life in prison.

F. <u>Need to Avoid Unwarranted Sentence Disparity Weighs in Favor of a Guidelines Sentence of Life in Prison</u>

In December 2010, the Court sentenced codefendant Abdul Kadir to life in prison. Kadir was, without a doubt, a key participant in the plot, with ties to violent radical Islamic figures including Mohsen Rabbani and Yasin Abu Bakr, but he did not play the leadership role in the conspiracy that Defreitas did. To sentence Defreitas, the plot's orchestrator, to a lesser sentence than Kadir would result in the type of unwarranted sentence disparity that § 3553(a)(6) counsels the Court to avoid.

G. <u>Other Factors</u>

None of the other factors identified in § 3553(a) are applicable to the case at hand. <u>See</u> 18 U.S.C. § 3553(a)(3) ("the kinds of sentences available"); § 3553(a)(5) ("any pertinent policy statement"); § 3553(a)(7) ("need to provide restitution").

14

III.     Conclusion

By conceiving and leading the dangerous plot to explode bombs, fuel tanks and pipelines at JFK Airport, the defendant committed a number of the most serious crimes in the United States Code. The only reasonable and just sentence for those crimes is a sentence of life in prison.

                                Respectfully submitted,

                                LORETTA E. LYNCH
                                United States Attorney

                    By:   /s/ Marshall L. Miller
                                Marshall L. Miller
                                Jason A. Jones
                                Zainab Ahmad
                                Berit W. Berger
                                Assistant U.S. Attorneys
                                (718) 254-6421/7553/6522/6134

Encl.

cc:      Clerk of the Court (DLI) (via ECF) (w/o encl.)
        Mildred Whalen, Esq. (via interoffice mail) (w/ encl.)
        Len Kamdang, Esq. (via interoffice mail) (w/ encl.)
        Officer Frank M. Marcigliano, Jr. (by hand) (w/ encl.)